STATE OF CONNECTICUT *v.* ROBERT W. BOWENS
(AC 29134)

Flynn, C. J., and Robinson and Mihalakos, Js.

Argued September 17—officially released November 24, 2009

*David B. Rozwaski*, special public defender, for the appellant (defendant).

*Richard K. Greenalch, Jr.*, special deputy assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *Charles M. Stango*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ROBINSON, J. The defendant, Robert W. Bowens, appeals from the judgment of conviction, rendered after a court trial, of criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1). On appeal, the defendant claims that the court improperly denied his motions for a judgment of acquittal because there was insufficient evidence to support a conclusion that he constructively possessed a firearm. We affirm the judgment of the trial court.

The court, as the finder of fact, reasonably could have found the following facts. At approximately 2 a.m. on March 5, 2006, Officer Domenic Tartaglia of the Bridgeport police department was helping a stranded motorist on the corner of 5th Street and Stratford Avenue, located in the east side of Bridgeport, when he heard several gunshots fired a few blocks away, in the area of Bunnell Street and Stratford Avenue. Several minutes later, Gilbert DelValle, a sergeant with the Bridgeport police department, spoke with two men on the corner of 6th Street and Connecticut Avenue who stated that they saw a white car leave the area immediately after the gunshots were fired. DelValle used his radio to inform the other officers that the suspect might be driving a white car, and, immediately thereafter, he heard several more gunshots fired a few blocks away. Although the officers canvassed both areas where gunshots were heard, which were only a few blocks from each other, nobody appeared to be injured.

While Tartaglia was canvassing the area in his police car, a white Ford Taurus that was driven by the defendant proceeded in front of Tartaglia on Stratford Avenue. Tartaglia followed the Taurus onto Bunnell Street and then onto Connecticut Avenue, although he waited for backup to arrive before attempting to stop the car. Once DelValle was able to join Tartaglia, Tartaglia activated his emergency lights and stopped the Taurus at the corner of 5th Street and Connecticut Avenue. As Tartaglia and DelValle approached the Taurus, however, it sped away, engaging the officers in a pursuit. Tartaglia proceeded to chase the Taurus down Connecticut Avenue, across 4th Street and up Stratford Avenue until it hit the curb and became disabled when the defendant attempted to negotiate a hard right turn onto Logan Street. The defendant and the passenger then exited the Taurus and ran in different directions. Before fleeing, though, the defendant stood next to the Taurus

under a streetlight and in front of the cruiser's headlights and looked at Tartaglia, during which time Tartaglia got a good view of the defendant at a distance of approximately twenty feet.

DelValle then arrived and secured the crash scene while Tartaglia chased the defendant on foot through several backyards and over several fences. Although Tartaglia lost track of the defendant, he was able to inform the other officers over the radio which direction the defendant was headed and that the defendant was wearing a baseball cap, a black jacket and had braids. Roughly fifteen minutes later, Officer Peter Billings of the Bridgeport police department saw the defendant using a pay telephone at the corner of Connecticut Avenue and Waterman Street. The defendant had braids, was wearing a T-shirt, and was bleeding from a leg wound that was visible through his ripped pants. Billings believed it odd that the defendant was wearing only a T-shirt because the temperature was below freezing. Because the defendant matched the description provided by Tartaglia and was not wearing clothing suited to the weather, Billings detained the defendant, who, shortly thereafter, was identified by Tartaglia as the driver of the Taurus whom he had chased.

Contemporaneous with these events, DelValle looked inside the Taurus to discern whether anybody was injured or any weapons were present. In plain view, DelValle observed a bag on the floor in front of the passenger seat that contained 12.5 grams of heroin, which had been divided into fifty-three small envelopes. In the same location was a small bag containing .162 grams of marijuana. Additionally, DelValle observed a .38 caliber shell casing located in plain view on the floor behind the passenger seat. After turning over scene security to another officer, DelValle retraced the chase route to ascertain whether any additional evidence had been discarded. Although neither Tartaglia nor DelValle

saw anyone throw anything from the Taurus, DelValle did find a Charter Arms .38 caliber revolver on the sidewalk in front of 73 4th Street, which was along the chase route. It subsequently was confirmed by Marshall Robinson, an expert firearms examiner, that the shell casing found on the floor behind the passenger seat of the Taurus was fired from the revolver that was found along the chase route. Robinson additionally explained that this revolver does not eject a shell casing after it is fired; the operator must open the cylinder manually and remove the spent shell casing.

The defendant then was arrested and processed, at which time it was revealed that he had $1293 in cash on his person. After being processed, the defendant was interviewed by Santiago Llanos and Sanford Dowling, both detectives with the Bridgeport police department and members of a joint task force involving the federal Bureau of Alcohol, Tobacco and Firearms and the Bridgeport police department.[1] During the interview, the detectives explained that they had information that the defendant's life was in danger because he previously had witnessed the murder of his friend, known as Tookie. The defendant acknowledged that his life was in danger, and he also stated that he had been shot at earlier in the day. He continued by explaining that he had cut his leg jumping over fences in an attempt to get away from the gunshots he had heard fired earlier in the evening. Although the defendant initially stated that he had not been in the Taurus, he modified that statement once he had learned that the car was being checked for fingerprints, admitting that he had been in the Taurus but only for a brief period of time. Additionally, the defendant admitted to the detectives that he

[1] This task force was formed to conduct gun investigations, to recover firearms to target illegal sales of firearms and to target drug gangs who use firearms to commit crimes. It is comprised of a federal and state prosecutor, special agents from the federal Bureau of Alcohol, Tobacco and Firearms and officers and detectives from the Bridgeport police department.

knew Quesha Rogers, who had rented the Taurus from the Hertz Corporation the day before.

The defendant was charged in a substitute information with criminal possession of a firearm in violation of § 53a-217 (a) (1); possession of narcotics with intent to sell in violation of General Statutes § 21a-277 (a); possession of narcotics with intent to sell by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b); possession of a weapon in a motor vehicle in violation of General Statutes § 29-38; and engaging the police in a pursuit in violation of General Statutes § 14-223 (b). Although the defendant initially elected a jury trial to resolve all counts, he moved to sever the counts and waived his right to a jury trial on the count of criminal possession of a firearm by a felon. A trial was held between April 10 and 13, 2007, although the court declared a mistrial because the jury inadvertently had been exposed to improper evidence during its deliberations.[2] After dismissing the jury, the court proceeded to find the defendant guilty of criminal possession of a firearm by a felon. Subsequently, the court denied the defendant's motions for a judgment of acquittal and for a new trial and sentenced him to a term of five years imprisonment, two years of which were mandatory. This appeal followed.

The gravamen of the defendant's arguments is that the court improperly denied his motions for a judgment of acquittal because the evidence did not support his conviction of criminal possession of a firearm. We disagree.

"In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence

[2] The defendant subsequently was found guilty by a different jury of possession of marijuana in violation of General Statutes § 21a-279 (c); possession of a weapon in a motor vehicle in violation of § 29-38; and disregard of an officer's signal in violation of § 14-223 (b). He was sentenced to a total of seven years imprisonment.

in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable. . . .

"[A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . . Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . Indeed, direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct . . . and from the cumulative

effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . [A]ny such inference cannot be based on possibilities, surmise or conjecture. . . . It is axiomatic, therefore, that [a]ny [inference] drawn must be rational and founded upon the evidence." (Internal quotation marks omitted.) *State* v. *Aloi*, 280 Conn. 824, 842–43, 911 A.2d 1086 (2007).

With these principles in mind, we now turn to the defendant's claims. General Statutes § 53a-217 (a) provides in relevant part: "A person is guilty of criminal possession of a firearm . . . when such person possesses a firearm . . . and (1) has been convicted of a felony . . . ." In this case, the defendant stipulated that he was a convicted felon on March 5, 2006, the day of the events at issue, and conceded that there was ample evidence in the record for a fact finder reasonably to have concluded both that the .38 caliber handgun found along the chase route was a revolver as defined by General Statutes § 53a-3 (18) and that the firearm was operable as defined in § 53a-3 (19). Accordingly, the only issue in dispute is whether there was sufficient evidence that the defendant had possession of the firearm that was found by DelValle along the chase route and whose shell casing was found behind the passenger's seat in the Taurus.

"Possess," as defined in § 53a-3 (2), "means to have physical possession or otherwise to exercise dominion or control over tangible property. . . ." Our jurisprudence elucidating this definition teaches that such possession may be actual or constructive. See *State* v. *Williams*, 110 Conn. App. 778, 785–87, 956 A.2d 1176, cert. denied, 289 Conn. 957, 961 A.2d 424 (2008). Nevertheless, "[b]oth actual and constructive possession require a person to exercise dominion and control over the [contraband] and to have knowledge of its presence and character. . . . Actual possession requires the defendant to have had direct physical contact with the

[contraband]. . . . Typically, the state will proceed under a theory of constructive possession when the [contraband is] not found on the defendant's person at the time of arrest, but the accused still exercises dominion and control." (Citations omitted; internal quotation marks omitted.) *State* v. *Coleman*, 114 Conn. App. 722, 728, 971 A.2d 46, cert. denied, 293 Conn. 907, 978 A.2d 1112 (2009). In this regard, "[t]he essence of exercising control is not the manifestation of an act of control but instead it is the act of being in a position of control coupled with the requisite mental intent. In our criminal statutes involving possession, this control must be exercised intentionally and with knowledge of the character of the controlled object." *State* v. *Hill*, 201 Conn. 505, 516, 523 A.2d 1252 (1986). Consequently, to prove that the defendant constructively possessed the firearm, it was the state's burden to prove that he knowingly had the power and the intention at a given time of exercising dominion and control over the firearm.

Finally, we note that when, as here, the defendant is not in exclusive possession of the place where the contraband is found, it may not be inferred that the defendant knew of the presence of the contraband and had control of it, unless there are other incriminating statements or circumstances tending to support such an inference. See *State* v. *Sanchez*, 75 Conn. App. 223, 242, 815 A.2d 242, cert. denied, 263 Conn. 914, 821 A.2d 769 (2003). Accordingly, "[t]o mitigate the possibility that innocent persons might be prosecuted for . . . possessory offenses . . . it is essential that the state's evidence include more than just a temporal and spatial nexus between the defendant and the contraband." (Internal quotation marks omitted.) *State* v. *Davis*, 84 Conn. App. 505, 510, 854 A.2d 67, cert. denied, 271 Conn. 922, 859 A.2d 581 (2004).

With respect to the requirement that the defendant had knowledge of the presence and character of the

.38 caliber revolver, we conclude that it was reasonable for the court to have found both that the revolver was in the Taurus and that the defendant knew of its presence and its character. In the first instance, we conclude that it is reasonable to infer from the evidence that the .38 caliber revolver found along the chase route was in the Taurus that the defendant had been driving on the night in question. The evidence revealed that immediately after gunshots had been fired in two separate locations just a few blocks away from each other, witnesses saw a white car leaving the area of one of the shootings, the defendant was driving a white Ford Taurus, and he ran from the police after being stopped. Subsequently, a revolver was found along the route that the police had chased the defendant as he fled from them, and the shell casing in the backseat of the Taurus was from a bullet fired from the revolver the police had recovered. See, e.g., *United States* v. *McKissick*, 204 F.3d 1282, 1291 (10th Cir. 2000) (defendant constructively possessed firearm where shell casing found in his car matched shell casings at crime scene even though gun not found); *Warren* v. *State*, 289 Ga. App. 481, 484, 657 S.E.2d 533 (where witness saw defendant shoot man and gun recovered from defendant's home did not match shell casing at crime scene, defendant held to possess constructively both gun found at home and gun used to shoot man even though second gun could not be found), cert. denied, 2008 Ga. LEXIS 508 (June 2, 2008). As in both *McKissick* and *Warren*, the possession by the defendant in this case of a shell casing that was linked definitively to an illegal firearm strongly supports a conclusion that he possessed the revolver. Consequently, the cumulative weight of these facts supports a reasonable inference that the revolver was in the Taurus operated by the defendant.

We likewise determine that the evidence supports a conclusion that the defendant knew of the revolver's

presence in the Taurus and was aware of its character. Robinson, the firearms examiner, explained that the revolver in question did not automatically eject the shell after a round was fired but, instead, required the cylinder to be opened and the spent shells to be removed. When considered in light of the fact that the revolver only held five rounds and that there were two series of gunshots fired at two different locations a few blocks from each other, it was reasonable for the court to have concluded that either the defendant or the passenger, while in the Taurus, removed the spent shells and reloaded the revolver between the two shootings. The reloading of a revolver by either the defendant or the passenger in the seat next to him provided a sufficient basis from which the court reasonably could have concluded that the defendant knew of the presence and the character of the revolver in the Taurus he was driving. See *State* v. *Williams*, 258 Conn. 1, 14–15, 778 A.2d 186 (2001) (gun located in plain view of driver is sufficient evidence of defendant's knowledge and character of gun). It therefore was reasonable for the court to have concluded that the defendant was aware of the presence and character of the revolver that likely was reloaded in the car while the defendant was driving.

Having concluded both that the revolver was in the Taurus driven by the defendant while fleeing from the police and that he was aware of the revolver's presence and character, we next inquire whether he exercised control or dominion over the revolver. We begin by noting that the defendant was driving the Taurus containing the revolver, which itself suggests control of the firearm. See *United States* v. *Hastings*, 918 F.2d 369, 373–74 (2d Cir. 1990) (possession of firearm in car operated by defendant evidence of control and dominion of firearm). More compelling, however, is the fact that the defendant fled from the police and only the

revolver was discarded, leaving the heroin and marijuana in the car. This suggests that the motivation in fleeing was to jettison the revolver. These evasive actions could not have been undertaken without the defendant's active participation, and they suggest that the defendant acted in concert with the passenger to dispose of the revolver.[3] See *McDaniels* v. *United States*, 718 A.2d 530, 532 (D.C. 1998) (driver of car containing firearms had dominion and control of firearms because he attempted to evade police); *Logan* v. *United States*, 489 A.2d 485, 491–92 (D.C. 1985) (driver of car containing firearm had dominion and control because he acted in concert with passengers to dispose of weapon before stopping for police).[4] Accordingly, we conclude that there was sufficient evidence from which the court reasonably could have concluded that the defendant exercised dominion and control over the revolver.

Moreover, there also were other factors that would support a reasonable inference that the defendant possessed the revolver. At the time of the defendant's

---

[3] In addition to evidencing dominion and control over the revolver, the evasive maneuvers taken by the defendant to discard only the revolver, while leaving the heroin and marijuana in the car, further buttress a conclusion that the revolver was in the Taurus and that the defendant knew of the revolver's presence and character.

[4] During oral argument, the defendant attempted to distinguish *McDaniels* on the ground that the defendant in that case owned the car he was driving, whereas the defendant in this case did not own the Taurus he was driving. We are not persuaded by such a distinction because there was sufficient evidence for the defendant here to have been found in constructive possession of the Taurus and the revolver, irrespective of who legally owned the Taurus. Although ownership may be evidence of constructive possession; see *United States* v. *Harris*, 369 F.3d 1157, 1163–64 (10th Cir.) ("[t]o prove constructive possession, the [g]overnment must show that [d]efendant knowingly held ownership, dominion *or* control over the object and premises where the contraband was found" [emphasis added; internal quotation marks omitted]), cert. denied, 543 U.S. 915, 125 S. Ct. 118, 160 L. Ed. 2d 198 (2004); ownership is not necessary for constructive possession to be established. See *United States* v. *DeCologero*, 530 F.3d 36, 67 (1st Cir.) ("[c]onstructive possession can be joint, does not require actual ownership of the firearm,

arrest, he was in possession of $1293 in cash, and there was both heroin and marijuana in the car he was operating, which bolsters a conclusion that the defendant also possessed a firearm because the connection between drug dealing and firearms is well established. See *State* v. *Mann*, 271 Conn. 300, 325, 857 A.2d 329 (2004) ("Connecticut courts repeatedly have noted that [t]here is a well established correlation between drug dealing and firearms. . . . Federal courts also have recognized this fact of life." [Citations omitted; internal quotation marks omitted.]), cert. denied, 544 U.S. 949, 125 S. Ct. 1711, 161 L. Ed. 2d 527 (2005). Additionally, the defendant fled from the police twice, once in the Taurus and a second time on foot. "[Our Supreme Court] previously has stated that [f]light, when unexplained, tends to prove a consciousness of guilt. . . . Flight is a form of circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Luther*, 114 Conn. App. 799, 817, 971 A.2d 781, cert. denied, 293 Conn. 907, 978 A.2d 1112 (2009). In the present case, the defendant did not discard the heroin or marijuana while fleeing, and his flight was otherwise unexplained, which suggests that the primary reason for the flight was to jettison the revolver. Thus, both the defendant's possession of drugs and his fleeing from the police further support a conclusion that the revolver found by DelValle was constructively possessed by the defendant on the night in question.

It bears emphasis that although "mere proximity to a gun is not alone sufficient to establish constructive possession, evidence of some other factor—including connection with a gun, proof of motive, a gesture implying control, evasive conduct, or a statement indicating involvement in an enterprise—coupled with proximity may suffice." (Internal quotation marks omitted.) *United States* v. *Mayberry*, 540 F.3d 506, 514 (6th

and can be established through circumstantial evidence"), cert. denied, 555 U.S. 1005, 129 S. Ct. 513, 172 L. Ed. 2d 376 (2008).

Cir. 2008). In this case, two separate series of gunshots were heard just a few blocks from one another. Witnesses described a white car leaving the scene immediately after the shootings, and the defendant was driving a white Taurus in the vicinity of the shootings shortly after the gunshots were heard. When the police attempted to stop the Taurus, the defendant fled, first in the Taurus and then on foot. In addition to the narcotics and the $1293 found in the defendant's possession, the police also recovered a .38 caliber shell casing from the Taurus. That shell casing had been a part of a bullet fired from the .38 caliber revolver that was found along the chase route, and that model firearm requires its operator to remove its spent shells manually before it can be reloaded. Moreover, the defendant had motivation to possess a firearm because he previously witnessed a homicide and knew that his life was in danger. Finally, it is noted that the defendant initially lied to the police about even being in the Taurus, and he was operating a car that contained fifty-three individual envelopes of heroin and a bag of marijuana on the floor in front of the passenger seat. Thus, in addition to the defendant's physical proximity to the shell casing found in the Taurus, there also is evidence of "connection with a gun, proof of motive . . . [and] evasive conduct"; (internal quotation marks omitted) id.; that further bolsters the court's finding of constructive possession. The cumulative impact of this evidence affords sufficient evidentiary support for the court reasonably to have concluded that the defendant was in constructive possession of the revolver.

The defendant's first rejoinder to the sufficiency of this evidence is that it is insufficient because it was not supported by any direct evidence. Specifically, the defendant notes that there were no fingerprints found on the revolver, no eyewitnesses saw him with the revolver, and the police did not conduct a gun residue

test to determine whether he had fired a gun on the night in question. That argument, however, is unavailing. As our case law makes clear, "[i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Aloi*, supra, 280 Conn. 842–43. Accordingly, the dearth of direct evidence in this case is of no moment because, as explained previously, there was sufficient circumstantial evidence from which the court reasonably could have concluded that the defendant was in constructive possession of the revolver.

Next, the defendant argues that there was insufficient evidence that he criminally possessed a firearm because a person may be at the scene of a crime, know criminality to be afoot and, nevertheless, not be involved in criminal activity. In support of this proposition, the defendant cites *United States* v. *Johnson*, 513 F.2d 819, 823–24 (2d Cir. 1975), in which the court held that there was insufficient evidence of constructive possession where the defendant had been a passenger in a car containing hidden narcotics and had lied to the police. In that case, however, there was no evidence that the defendant had knowledge of the narcotics that were hidden inside the front door panel on the passenger's side. Id. In the present case, by contrast, the revolver had to be in plain sight while it was being reloaded, supporting a conclusion that the defendant had knowledge of the revolver. Moreover, in *Johnson*, the defendant was the passenger of the car and took no steps to control the drugs that he did not know existed in the passenger's side door. Id., 823. Here, the evidence reasonably supported a conclusion that the defendant acted in concert with the passenger to dispose of the

revolver, which bolsters a conclusion that the defendant exercised dominion and control over the revolver. Consequently, the defendant's reliance on *Johnson* is misplaced.

The defendant next cites *State* v. *Brunori*, 22 Conn. App. 431, 440, 578 A.2d 139, cert. denied, 216 Conn. 814, 580 A.2d 61 (1990), in support of his argument that the revolver recovered along the chase route could not be ascribed to him unless the police observed some furtive movement to suggest that he discarded an object. That case, however, is inapposite to the facts presented here. In *Brunori*, the defendant was standing in a public area outside an apartment complex with two other men when the police approached. Id., 432–33. As the police drew closer, the defendant bent down and then stood up and began walking away with the other two men. Id. Although the police did not see the defendant discard an object when he bent down, they did recover cocaine and a hypodermic needle in the proximate area where the defendant originally had been standing. Id., 433–34. Noting that "a defendant who was never observed placing or discarding the contraband in the location it was later discovered cannot be found guilty of possession in the absence of other evidence"; id., 434; the court held that there had been insufficient evidence to convict the defendant of possessing narcotics. By contrast, the defendant here was driving a car that contained a shell casing that came from the revolver that was recovered along the chase route. Indeed, Robinson testified that the "cartridge case [recovered from the Taurus] was fired in [the revolver found along the chase route] to the exclusion of all other firearms in the world." Thus, there is a direct link between the defendant and the discarded contraband in this case that conspicuously was absent in *Brunori*.

The defendant's final argument is that there was insufficient evidence to support his conviction of criminal possession of a firearm because he was not solely

in possession of the car in which the contraband had been located. Citing *State* v. *Cruz*, 28 Conn. App. 575, 579–80, 611 A.2d 457 (1992), the defendant argues that because possession may not be inferred from nonexclusive possession absent other incriminating circumstances, there was insufficient evidence of possession in this case because there was a passenger in the Taurus with the defendant and other incriminating evidence is absent. We do not agree with this claim.

In the first instance, we note that in *Cruz* there was no more than a temporal and spatial nexus between the defendant and the contraband. The marijuana seed that was located in the backseat of the car operated by the defendant in *Cruz* was detected only after the police used a 30,000 candlepower flashlight to examine the car's interior, and the "E-Z Wider" cigarette rolling papers were found in the center console. Id., 577. Thus, it was less likely that the defendant in *Cruz* knew of the contraband's presence in the car he was driving than is true of the defendant in the present case. Moreover, in *Cruz*, the defendant did not take evasive action that manifested an intent to exercise dominion and control over the contraband, which stands in contradistinction to the actions of the defendant in this case. From those actions, it can be reasonably inferred that the defendant fled the police for the express purpose of discarding the revolver.

*State* v. *Cruz*, supra, 28 Conn. App. 575, also is distinguishable because there were incriminating circumstances in the present case that were not present in *Cruz*. By way of example, in the present case, the police were investigating two shootings, and witnesses at the scene described the type of car the defendant was driving and stated that it had left the scene immediately after the gunshots were heard. In *Cruz*, the police were engaged in a routine traffic stop rather than investigating an allegation that a person driving a car like the

one operated by the defendant was in possession of illicit substances. Id., 576. Similarly, the defendant in the present case engaged the police in two separate pursuits, which, as explained previously, was further evidence of a consciousness of guilt. The defendant in *Cruz* did not run from the police and, in fact, was cooperative. Id. Accordingly, we conclude that *Cruz* is distinguishable from the present case both because there was evidence that the defendant here knew the revolver was in the Taurus and exercised dominion and control over it and because there were additional incriminating circumstances in the present case that were not present in *Cruz*.

The judgment is affirmed.

In this opinion the other judges concurred.